IN THE COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO

| | | |
|---|---|---|
| THE STATE OF ARIZONA, | ) | |
| | ) | 2 CA-CR 2002-0307 |
| Appellee, | ) | DEPARTMENT B |
| | ) | |
| v. | ) | O P I N I O N |
| | ) | |
| CHRISTINA MARIE GEORGE, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

APPEAL FROM THE SUPERIOR COURT OF PIMA COUNTY

Cause No. CR-20012085

Honorable Michael Alfred, Judge

AFFIRMED IN PART;
MODIFIED IN PART AND REMANDED

Terry Goddard, Arizona Attorney General
  By Randall M. Howe and Kerri L. Chamberlin                                              Tucson
                                                                          Attorneys for Appellee

Susan A. Kettlewell, Pima County Public Defender
  By John J. Seamon                                                                       Tucson
                                                                          Attorneys for Appellant

E C K E R S T R O M,  Judge.

¶1        Appellant Christina Marie George was charged with attempted first-degree murder, aggravated assault with a deadly weapon, aggravated assault causing serious physical injury, kidnapping, and possession of a deadly weapon by a prohibited possessor. After a trial, a jury found George guilty of aggravated assault with a deadly weapon and aggravated assault causing serious physical injury, both class three felonies. The trial court sentenced her to concurrent, aggravated prison terms of fifteen and seven years. George contends her convictions should be reversed, arguing that (1) there was insufficient evidence to support her conviction on the charge of aggravated assault causing serious physical injury; (2) the trial court abused its discretion in denying a motion to strike a prospective juror for cause; (3) the trial court abused its discretion in admitting evidence without a proper foundation; and (4) the trial court erred in denying her motion for change of venue. We affirm in part, modify the judgment in part, and remand the case for resentencing.

## Background

¶2        In April 2001, George and two companions went to a Tucson motel to talk to J. about a missing wallet. An altercation ensued and George shot J. in the neck. The bullet entered the right side of her neck and exited her right armpit. J. was hospitalized for two days and then released. When Pima County deputy sheriffs arrested George a few weeks later, she confessed that she had shot J. but claimed it had been an accident.

## Sufficiency of the Evidence

¶3        George contends the state presented insufficient evidence for rational jurors to have found her guilty of aggravated assault causing serious physical injury. In reviewing the sufficiency of evidence, we view the facts in the light most favorable to upholding the jury's verdict and

resolve all reasonable inferences against the defendant. *State v. Atwood*, 171 Ariz. 576, 596, 832 P.2d 593, 613 (1992). We will not disturb a defendant's conviction unless there is a complete absence of probative facts to support the verdict, *State v. Arredondo*, 155 Ariz. 314, 316, 746 P.2d 484, 486 (1987), and unless rational jurors could not have found the defendant guilty beyond a reasonable doubt. *State v. Whalen*, 192 Ariz. 103, 111, 961 P.2d 1051, 1059 (App. 1997).

¶4        Section 13-105(34), A.R.S., defines "[s]erious physical injury" as an injury that "creates a reasonable risk of death, or which causes serious and permanent disfigurement, serious impairment of health or loss or protracted impairment of the function of any bodily organ or limb." The jury was instructed in accordance with this definition. The physician who had treated J. at the hospital testified that the bullet had entered the right posterior side of her neck and had exited through her right armpit, causing significant loss of blood. Although the wound did not cause any vascular damage, J. did lose some sensation, strength, and muscle control in her right arm. The doctor testified that J. had not regained full function of her arm during her two-day hospital stay. He refused to speculate on whether that impairment would be temporary, protracted, or permanent. George contends neither this nor any other evidence established beyond a reasonable doubt that J.'s injuries satisfied the statutory definition of serious physical injury. Given the applicable statutory scheme, the nature of J.'s injury, and the state's failure to introduce substantial evidence about the extent and duration of that injury, we are compelled to agree.

¶5        The state presented no evidence that the injury itself had exposed J. to a reasonable risk of death or had caused her to suffer serious or permanent disfigurement. We must therefore determine whether the state presented sufficient evidence from which reasonable jurors could have concluded beyond a reasonable doubt that the injury had seriously impaired her health or caused

3

her to suffer a protracted impairment of the use of her arm. To answer that question, we must first determine the meaning of the terms "serious impairment of health" and "protracted impairment" in § 13-105(34).

**¶6** The interpretation of a statute poses a question of law subject to our *de novo* review. *State v. Fell*, 203 Ariz. 186, ¶6, 52 P.2d 218, ¶6 (App. 2002). "[O]ur primary goal is to discern and give effect to the legislature's intent." *Id.* To do so, we first "examine the plain language of the statute and, if it is unclear, then consider other factors such as the statute's context, history, subject matter, effects and consequences, spirit, and purpose." *Id.* We must also try "to harmonize related statutes and 'aim to achieve consistency among them' within the context of the overall statutory scheme." *Id., quoting Bills v. Ariz. Prop. & Cas. Ins. Guar. Fund*, 194 Ariz. 488, ¶18, 984 P.2d 574, ¶18 (App. 1999); *see also State v. Sweet*, 143 Ariz. 266, 270-71, 693 P.2d 921, 925-26 (1985).

**¶7** The term "serious" for an injury is defined in *Black's Law Dictionary* 1371 (7th ed. 1999) as "dangerous; potentially resulting in death or other severe consequences." *See also The American Heritage Dictionary* 1120 (2d coll. ed. 1991) (defining "serious" as "grave in character, quality or manner"). Thus, the plain meaning of "serious impairment of health" suggests that the degree of the impairment must be significant rather than minor. *See, e.g., State v. Greene*, 182 Ariz. 576, 582-83, 898 P.2d 954, 960-61 (1995) (for purposes of former version of § 13-105(34) and enhanced sentencing statute, sexual assault victim suffered serious physical injury to face and nose, but "pain, roughness, and scratching inflicted during" sexual assaults did not meet statutory definition of serious physical injury). The term "protracted," which is used in connection with "impairment," is defined as "lengthen[ed] in time; prolong[ed]." *The American*

4

*Heritage Dictionary* 997. Notwithstanding these definitions of the relevant terms, their precise meaning in the context of an assault is not entirely clear. We have not found any Arizona cases that analyze and apply these specific terms in the context presented here. *See State v. Garcia*, 138 Ariz. 211, 214, 673 P.2d 955, 958 (App. 1983) (substantial impairment of health does not include emotional injuries; breaking of hymen not serious and permanent disfigurement); *Greene*, 182 Ariz. at 582-83, 898 P.2d at 960-61 (permanent change in appearance of nose caused by beating constituted serious and permanent disfigurement). To determine the legislature's intent, we find guidance in the statutory scheme relating to assaults as a whole.

¶8 In the context of assaults that are defined by the nature of an injury, our legislature has provided a tiered structure of punishment based on the severity of the injury.[1] A person commits simple assault by intentionally causing any injury to another. A.R.S. § 13-1203(A)(1). Simple assault is classified as a misdemeanor, an offense for which a defendant may be placed on probation and that carries a maximum punishment of six months in jail. § 13-1203(B); A.R.S. § 13-707(A)(1). But, if the assault results in "temporary but substantial disfigurement, temporary but substantial loss or impairment of any body organ or part, or a fracture of any body part," the offense is no longer simple assault but aggravated assault, a nondangerous class four felony. A.R.S. § 13-1204(A)(11) and (B). In the absence of other sentencing enhancements, a defendant who violates § 13-1204(A)(11) may be placed on probation or sentenced to a maximum prison

---

[1]Assaults are also classified for punishment purposes by the status of the victim and by the nature of the instrumentality used to commit the assault. *See* A.R.S. § 13-1204(A)(2) (making the offense more serious when defendant uses deadly weapon or dangerous instrument) and § 13-1204(A)(4)-(6), (9), (10) (creating a more serious offense if victim is under fifteen, peace officer, school teacher, fire fighter, or licensed health care practitioner).

term of 3.75 years. *Compare* A.R.S. §§ 13-702(A) and 13-901 *with* A.R.S. § 13-604(F). Here, we must determine whether the state presented sufficient evidence for the jury to find George guilty of a considerably more serious offense—aggravated assault resulting in serious physical injury, an offense for which probation is not available and for which she faced a maximum term of fifteen years' imprisonment. *See* § 13-604(I); § 13-1204(A)(1).

¶9 From this, we can conclude that the legislature intended "serious physical injury" to refer to an injury more serious than those injuries justifying a mere nondangerous, class four felony classification. *See* A.R.S. § 13-101(4) (purpose of title 13 is to "differentiate on reasonable grounds between serious and minor offenses and to prescribe proportionate penalties for each"); *Riddick v. United States*, 806 A.2d 631, 638 (D.C. 2002) (severity of punishment is relevant factor in formulating definition of serious bodily injury). Although the legislature does not precisely define how gravely a victim's health must be impaired to constitute "serious impairment of health," such impairment must be more than a "temporary but substantial" impairment of health and more than the usual temporary impairment caused by the fracture of a body part. *Compare* § 13-105(34) (defining serious physical injury) *with* § 13-1204(A)(11). Similarly, although the legislature did not delimit the duration of a "protracted" impairment of a limb necessary to support a finding of "serious physical injury," the impairment must, at minimum, be more protracted than either a "temporary but substantial" impairment of the use of a limb or the healing time of a normal fracture. *Compare* § 13-105(34) *with* § 13-1204(A)(11).

¶10 Finally, as noted above, a finding of serious physical injury may also be based on the victim's having suffered a physical injury that "creates a reasonable risk of death" or one that "causes serious and permanent disfigurement." § 13-105(34). Thus, in order to harmonize § 13-

6

105(34) with related statutory provisions, including § 13-1204, as we are required to do, *see Sweet*, 143 Ariz. at 270-71, 693 P.2d at 925-26, we conclude that the legislature intended "serious impairment of health" to be comparable in terms of its gravity to an injury that creates a reasonable risk of death or substantial and permanent disfigurement.

¶11      That the legislature intended "serious impairment of health" and "the protracted impairment of any limb" to be construed as requiring grave injuries is further supported by the provisions of the Model Penal Code, upon which Arizona has based its criminal code. *See State v. Mott*, 187 Ariz. 536, 540, 931 P.2d 1046, 1050 (1997); *State v. Willoughby*, 181 Ariz. 530, 538, 892 P.2d 1319, 1327 (1995); *State v. Sanchez*, 174 Ariz. 44, 47, 846 P.2d 857, 860 (App. 1993) (Model Penal Code is a source of current Arizona criminal statutes); Rudolph J. Gerber, *Criminal Law of Arizona*, Author's Preface IV, at vi (1978) (1962 Model Penal Code inspired most of Arizona Criminal Code, which became effective in 1978). Appellate courts assume a legislature that enacts a statute based on a model or uniform act intended to adopt the construction its drafters placed on the act. *Sanchez*, 174 Ariz. at 47, 846 P.2d at 860.

¶12      The language used in § 13-105(34) to define "serious physical injury" parallels the language in the Model Penal Code defining "serious bodily injury." Model Penal Code § 210.0(3) (1986). The drafters of the code commented on that definition as follows:

> Physical harm of special gravity is designated "serious bodily injury" under Section 210.0(3). That concept includes any "bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." This definition encompasses the *drastic harms* covered under the common-law felony of mayhem and adds a residual category of harm creating substantial risk of death.

The distinction between bodily injury [for simple assault] and serious bodily injury is one of the chief determinants of grading under the assault offense. . . . This differential [in punishment range] is appropriate in light of the very broad coverage achieved under the lesser requirement and the *extreme gravity of injury* punished under the greater.

Model Penal Code and Commentaries § 211.1 cmt. 3 (1980) (emphasis added; footnote omitted). Because our legislature apparently modeled its definition of "serious physical injury" after the Model Penal Code, we can conclude that, like the drafters of the Model Penal Code, it intended to describe "drastic harms" and injuries of "extreme gravity."

¶13        Here, the state presented sufficient evidence from which a jury could reasonably have concluded that J. had suffered a "temporary but substantial" impairment of the use of her arm and a "temporary but substantial" impairment of her health. However, the state presented no evidence that J.'s injuries had caused her to suffer a sustained impairment of her health or a protracted impairment of the use of her arm. The physician who had treated J. at the hospital was the state's only expert. He testified that she had demonstrated impaired mobility of her arm during the two days she had been in the hospital. He refused to speculate on how long she might have continued to suffer such impairment. Because the evidence showed nothing more than that J. had experienced two days of impaired mobility, we cannot say there was sufficient evidence that she had suffered a "protracted impairment," given our conclusion on the legislature's intent that such impairment be substantial and grave before it may be regarded as protracted.

¶14        And, even though we view the facts in the light most favorable to upholding the jury's verdict and resolve all reasonable inferences against George, *see Atwood*, 171 Ariz. at 596, 832 P.2d at 613, we conclude there was also insufficient evidence to support a finding that J. had

8

suffered a "serious impairment of health." Again, the evidence merely showed that her mobility had been impaired for two days. And although a gunshot wound may, in most circumstances, result in severe injuries that seriously impair the victim's health, the mere fact that a victim has been shot, without more, does not warrant that finding. Rather, the gravity of the injuries and the effect on the victim's health must be established by the evidence beyond a reasonable doubt. The state failed to present such evidence here. Accordingly, the jury could not have lawfully found George guilty beyond a reasonable doubt of aggravated assault resulting in serious physical injury.[2] *See Whalen*, 192 Ariz. at 111, 961 P.2d at 1059. But, because the evidence was more than adequate to support a conviction for the necessarily included offense of aggravated assault causing temporary but substantial impairment pursuant to § 13-1204(A)(11), a class four felony, we modify the judgment to reflect George's conviction for the lesser offense and remand the case to the trial court to resentence George accordingly. *See* Ariz. R. Crim. P. 31.17(d), 17 A.R.S.; *State v. Eliason*, 25 Ariz. App. 523, 529, 544 P.2d 1124, 1130 (1976).

## Refusal to Strike Prospective Juror for Cause

¶15 George next contends that the trial court abused its discretion in denying her motion to strike prospective juror L. for cause and that the court thereby deprived her of a substantial right by forcing her to use a peremptory challenge to strike L.[3] We review for clear abuse of discretion a trial court's denial of a request to strike a juror for cause. *State v. Medina*, 193 Ariz.

---

[2]We leave undisturbed George's conviction for aggravated assault with a deadly weapon.

[3]We do not address the unsupported suggestion George makes for the first time in her reply brief that the trial court abused its discretion by failing to strike juror W. *See* Ariz. R. Crim. P. 31.13(c), 17 A.R.S.

504, ¶18, 975 P.2d 94, ¶18 (1999). We will not set aside the trial court's decision unless the court exercised discretion that was "manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." *State v. Dunlap*, 187 Ariz. 441, 458, 930 P.2d 518, 535 (App. 1996). Rule 18.4(b), Ariz. R. Crim. P., 17 A.R.S., permits a court, on its own initiative or on motion of a party, to excuse a prospective juror when there is "reasonable ground to believe that [the] juror cannot render a fair and impartial verdict."

¶16 During voir dire, the prosecutor explained to prospective jurors that the case involved illegal drugs. He then asked whether any juror had "such strong feelings in regards the use of methamphetamines, controlled substances, alcohol, . . . [or] any sort of intoxicating substances" that sitting as a fair and impartial juror would be difficult. When L. responded that she had "always been against drugs and . . . [had] had an alcoholic husband," the trial court asked her whether "just the fact of any possible use of that substance[] like that, would that, just that fact alone, make it such that you would be just unable to listen to their testimony?" L. responded, "I hope not." The trial court accepted this answer and the prosecutor passed the panel.

¶17 Defense counsel later returned to the issue of illegal drug use. He again asked the prospective jurors whether anyone had doubt about the ability to be fair, knowing that the case included evidence of methamphetamine use. L. replied, "Sort of." Upon further questioning, L. stated that she "might" have trouble being fair in the case. At that point, the following discussion took place in a bench conference:

> [DEFENSE COUNSEL]: I guess she's va[]cillated so much, Your Honor, on this issue, couple of others, I really think I move to strike her, try to get a person that's feeling more clear about being fair and impartial.

10

THE COURT: Here is the problem. We don't have any other people.

. . . .

. . . [I]t will take us down to where we are going to have 12, no alternates.

. . . .

[DEFENSE COUNSEL]: I think that she is just starting off she is not going to be able to be fair. I mean the idea of this is to have someone that can go through all the factors and say I'm going to be fair.

The trial court then questioned the juror in open court as follows:

THE COURT: . . . [G]iven all the questions that you have been asked, and do you feel that in light of the sentiments that you have ex[]pressed do you feel that you would be unable to sit on this case as a fair and impartial juror, decide it solely on evidence presented, or do you think that you would be able to do that?

[L.]: I think I'd be able to sit on it.

THE COURT: Well, that's half the question. The other half is do you think that you would be able to do that in a fair and impartial manner and decide it based solely upon the evidence, or do you think that any feelings you may have about either drug use or any of the other things that the attorneys have brought up would cause you to be biased or prejudiced towards one side or the other?

[L.]: Right now I don't know the extent of the drug use.

THE COURT: I understand it's not an easy thing to do.

[L.]: Pardon?

THE COURT: I said I understand it's not an easy position that you're placed in or questions that you're asked to answer, but just give me the best answer you can.

[L.]: I think I can do it.

11

THE COURT: All right.

Resuming the discussion at the bench, defense counsel pointed out that "the drug use is extensive in this particular case" and requested permission to ask L. "one further question knowing that fact."

> THE COURT: What are you going to ask her?
>
> [DEFENSE COUNSEL]: Well, given the fact that there is extensive drug use in this case, whether that in fact—
>
> THE COURT: I just covered that with her. Anyway, challenge for cause is denied.

¶18 George argues that L.'s "serious misgivings about her ability to be fair and impartial" and her inability to clearly and unequivocally state her willingness to set aside her feelings required the trial court to grant George's motion to strike L. for cause.

¶19 Prospective jurors should be struck for cause whenever their answers during voir dire "demonstrate serious misgivings about the ability to be fair and impartial." *State v. Sexton*, 163 Ariz. 301, 302-03, 787 P.2d 1097, 1098-99 (App. 1989). Although the trial court was best equipped to evaluate L.'s demeanor and the tenor of her answers, *see State v. Clayton*, 109 Ariz. 587, 592, 514 P.2d 720, 725 (1973), L. clearly had serious reservations about her ability to be objective and unbiased in deciding a case that involved considerable illegal drug use. L.'s answers were uncertain, doubtful, and equivocal rather than decisive or resolute, despite the trial court's repeated attempts to rehabilitate her. Her answer to the court's final query, "I think I can do it," does not constitute an unequivocal avowal of impartiality. *See State v. Rodriguez*, 131 Ariz. 400, 401-02, 641 P.2d 888, 889-90 (App. 1981) (trial court should have struck juror for cause although juror stated, "I think I would try and be fair"); *Sexton*, 163 Ariz. at 302-03, 787 P.2d at 1098-99

12

(juror must provide court assurance of impartiality). On the other hand, a juror's statement of impartiality need not be couched in absolute terms to assure the trial court of the juror's fitness to sit on the jury. *State v. Poehnelt*, 150 Ariz. 136, 146-47, 722 P.2d 304, 314-15 (App. 1985); *see also Clayton*, 109 Ariz. at 592-93, 514 P.2d at 725-26 (juror who initially stated she could not impartially apply law of self-defense adequately was rehabilitated when she concluded, "I will try to follow the law"). Although we would prefer that trial courts inquire further of jurors who utter such equivocal expressions of impartiality, we need not determine the close question of whether the trial court erred in failing to strike L. for cause because we find no evidence that such failure prejudiced George in any fashion.

¶20 George argues that any error in the trial court's failure to strike a juror for cause requires us to reverse her convictions, regardless of whether she suffered any prejudice as a result of that error. She relies on *State v. Huerta*, 175 Ariz. 262, 266-67, 855 P.2d 776, 780-81 (1993), to support this argument. Although we agree *Huerta* is supportive, our supreme court overruled it a few months after George filed her opening brief in this appeal. *See State v. Hickman*, 205 Ariz. 192, ¶27, 68 P.3d 418, ¶27 (2003) (holding that *Huerta* and the long line of Arizona cases upon which it relied "no longer remain[] authoritative"). A trial court's erroneous failure to strike a venireperson for cause is now subject to harmless error review. *Id.* at ¶28. As a result, a defendant must show prejudice before an otherwise valid conviction will be reversed. *Id.* at ¶¶30-31.

¶21        George does not argue that she was prejudiced by the trial court's failure to strike L. for cause,[4] nor is such prejudice established by the record before us. First, L. did not serve on George's jury. Second, nothing in the record suggests that any juror who did ultimately serve on the jury was biased or partial. Even though we do not necessarily approve the trial court's denial of George's motion to strike L. in light of her equivocal answers, we conclude that George was, nonetheless, tried by a fair and impartial jury. Because George has not shown that she was prejudiced by the denial, we reject her request to reverse her convictions.

### Change of Venue

¶22        George contends the trial court should have granted her motion for a change of venue, made on the ground pretrial publicity had affected the objectivity of her prospective jury pool. In arguing the motion, George expressed concern that news items about J.'s later murder by a third party would "rub off" on George and could confuse jurors about whether George had been involved in J.'s murder. In denying the motion, the trial court stated that "the only way to find out if you can pick a fair and impartial jury is to try to do it." We review a trial court's ruling on a motion for change of venue for a prejudicial abuse of discretion. *State v. Bible*, 175 Ariz. 549, 566, 858 P.2d 1152, 1169 (1993). In evaluating pretrial publicity, we focus on the effect rather than the amount of publicity. *State v. Jones*, 197 Ariz. 290, ¶44, 4 P.3d 345, ¶44 (2000). We use a two-step process to review the effect of pretrial publicity. *State v. Murray*, 184 Ariz. 9, 26, 906 P.2d 542, 559 (1995). We first consider whether the publicity so pervaded the

---

[4]The state filed its answering brief after *Hickman* was decided and properly cited *Hickman* for the proposition that George must show prejudice to be entitled to relief on this claim. Nonetheless, George did not address the issue of prejudice in her reply brief.

trial that prejudice can be presumed and, if it did not, we then consider whether the defendant has shown actual prejudice among the jurors. *Id.*

1. Presumed Prejudice

**¶23** There is a presumption of prejudice when a defendant can show that jurors were exposed to pretrial publicity "'so outrageous that it promise[d] to turn the trial into a mockery of justice or a mere formality.'" *Jones*, 197 Ariz. 290, ¶44, 4 P.3d 345, ¶44, *quoting Bible*, 175 Ariz. at 563, 858 P.2d at 1166. But pretrial publicity meets this threshold only when it is "so unfair, so prejudicial, and so pervasive that we cannot give any credibility to the jurors' answers during voir dire affirming their ability to decide the case fairly." *Bible*, 175 Ariz. at 565, 858 P.2d at 1168. Nothing in this record suggests that the pretrial publicity was either unfair or prejudicial.

**¶24** In the abstracts of ten news items George attached to her motion for change of venue, each of which appeared after J. had been slain, only two contained both George's and J.'s names. Both those items merely reported investigators' allegations that George had quarreled with or shot J. Another abstract reported that George had been incarcerated after a pursuit by police that had resulted in three collisions, but it did not mention J. The remaining abstracts merely recounted some of the circumstances relating to J.'s later murder and the arrest of her accused killer. This publicity was minimal and did not warrant discounting jurors' answers during voir dire about their ability to be fair and impartial. *See id.* George has not shown that the pretrial publicity should have been presumed prejudicial.

2. Actual Prejudice

¶25      Having determined there was no basis for presuming prejudice, we turn to whether George showed actual prejudice among jurors. *See Murray*, 184 Ariz. at 26, 906 P.2d at 559. To show actual prejudice, a defendant must demonstrate that pretrial publicity caused a juror to form preconceived notions about the case that he or she was unable to set aside in deciding it. *See State v. Trostle*, 191 Ariz. 4, 11, 951 P.2d 869, 876 (1997). Mere knowledge of a case does not justify disqualifying a juror. *Id.*

¶26      During voir dire, no juror admitted having formed opinions about George's guilt or innocence. In addition, those jurors who reported having seen pretrial publicity all stated that it would not affect their ability to serve as fair and impartial jurors. Thus, George has not shown that actual prejudice existed.

¶27      Because George established neither actual prejudice nor a basis for presuming prejudice, she failed to show that the pretrial publicity was likely to deprive her of a fair and impartial jury. As a result, the trial court did not abuse its discretion in denying her motion for change of venue. *See Bible*, 175 Ariz. at 566, 858 P.2d at 1169.

## Admission of Evidence

¶28      Finally, George contends the trial court erred by admitting into evidence without a proper foundation a letter she had purportedly written. Whether a party has laid sufficient foundation for the admission of evidence is within the sound discretion of the trial court, and we will not disturb its ruling absent a clear abuse of that discretion. *State v. Jackson*, 170 Ariz. 89, 93, 821 P.2d 1374, 1378 (App. 1991).

16

¶29 During trial, the state sought to introduce a copy of a letter that a correctional officer had found in George's jail cell. The officer testified that she had found the letter beside George's bed between the pages of a library book George had checked out of the prison library. Defense counsel objected to the letter on the ground of insufficient foundation. George asserts, as she did below, that there was "absolutely no showing that [she] had written the letter, knew about it or authorized it."

¶30 When a party seeks to introduce evidence, the "requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Ariz. R. Evid. 901(a), 17A A.R.S. Rule 901(b)(4) provides that this standard is satisfied if the evidence can be identified by its distinctive characteristics taken in conjunction with the circumstances of the case. *See State v. Romanosky*, 162 Ariz. 217, 224, 782 P.2d 693, 700 (1989). The circumstances here support a finding that the letter was what the state claimed it was—a letter George had written. Not only was the letter found in George's jail cell in a book checked out to her, it contained angry, inculpatory statements about J., as well as personal knowledge about the attacks on J.

¶31 Although the letter was unsigned, there were other circumstances supporting its admissibility. Therefore, any uncertainty about its authorship went to the weight of the evidence, not to its admissibility. *See State v. Pereida*, 170 Ariz. 450, 455, 825 P.2d 975, 980 (App. 1992). The location where the letter was found combined with its contents provided the trial court a reasonable basis for admitting it into evidence. *See Romanosky*, 162 Ariz. at 224, 782 P.2d at 700. Accordingly, the trial court did not abuse its discretion in admitting the letter.

17

## Conclusion

¶32    Having concluded that the state failed to introduce evidence from which reasonable jurors could conclude beyond a reasonable doubt that George had committed aggravated assault causing serious physical injury but that the state introduced sufficient evidence to support a conviction under § 13-1204(A)(11), we modify the judgment accordingly and remand the case for resentencing.  However, we affirm George's conviction and sentence for aggravated assault with a deadly weapon.

_____
PETER J. ECKERSTROM, Judge

CONCURRING:


_____
PHILIP G. ESPINOSA, Chief Judge


_____
JOHN PELANDER, Presiding Judge