NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

JUSTIN M. SICARI, *Appellant.*

No. 1 CA-CR 25-0153
FILED 5-19-2026

Appeal from the Superior Court in Maricopa County
No. CR2022-146930-001
The Honorable Mark H. Brain, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Eliza Ybarra
*Counsel for Appellee*

Apfel Law Group, Phoenix
By Seth M. Apfel
*Counsel for Appellant*

## MEMORANDUM DECISION

Judge Angela K. Paton delivered the decision of the Court, in which Presiding Judge Michael S. Catlett and Judge Jennifer M. Perkins joined.

**P A T O N**, Judge:

¶1          Justin Sicari ("Sicari") appeals his convictions and sentences for kidnapping, two counts of simple assault, and aggravated assault as a dangerous offense.  For the following reasons, we affirm.

### FACTS AND PROCEDURAL HISTORY

¶2          We view the facts in the light most favorable to upholding the jury's verdict.  *State v. Reaves*, 252 Ariz. 553, 558, ¶ 2 (App. 2022).

¶3          On December 10, 2022, Sicari picked up his girlfriend, Martha[1], for dinner after her first day of a week-long therapy program.  The two argued at the restaurant, and Sicari dropped Martha off at her hotel.  Martha later went to Sicari's condominium, despite him warning her not to.  Martha testified she wanted to see Sicari because she loved him and worried about being punished later if she did not go.

¶4          Upon her arrival, the two argued in front of Sicari's roommate.  His roommate soon left, after which Sicari "grabbed [Martha] by [her] shoulders and threw [her] across the room," where she landed on her side.  He then kicked Martha all over her body, including on her stomach, face, and the back of her head.  He told Martha that "if [she] didn't shut the fuck up that he would kill [her]" and would "start breaking [her] fingers one at a time."  He got on top of her, banged her head on the tile, and strangled her.  He eventually stopped strangling her, told her to sit down on the edge of the couch in the living room, picked up a gun from the coffee table in the same room and pointed it at "the temple of [her] head" while threatening to kill her children and friends.  Martha estimated he hit her in the head 50-60 times.  He eventually told her that "if [she] want[ed] to live and get the fuck out, run," which she did.

---

[1] We use a pseudonym to protect the victim's identity.  *See* Ariz. R. Sup. Ct. 111(i).

**¶5**        Martha went to the emergency room after stopping at her hotel to grab a few items.  Her treating doctor was a mandatory reporter who directed a staff person to call the police.  But at that time, Martha was unwilling to tell the officer about what caused her injuries.  Martha continued to communicate with Sicari and texted him that she loved him.

**¶6**        A few days later, on December 13, 2022, Martha contacted police, and an officer responded to take a report from her regarding the incident.  That same day, Martha phoned Sicari and recorded their conversation on her iPad.

**¶7**        The State charged Sicari with kidnapping (count 1), aggravated assault (count 2), aggravated assault with a serious physical injury (count 3), aggravated assault (count 4), and preventing the use of a telephone in an emergency (count 5).

**¶8**        After a 14-day trial, at which Sicari testified over multiple days, the jury convicted Sicari on one count of kidnapping, two counts of the lesser-included offense of simple assault, and one count of aggravated assault as a dangerous offense.  It acquitted him on preventing the use of a telephone in an emergency.  At his April 2025 sentencing, the court sentenced him to a total of 7.5 years' imprisonment with 5 years' supervised probation to follow.  Sicari timely appealed.  We have jurisdiction pursuant to Article 6, Section 9 of the Arizona Constitution and Arizona Revised Statutes ("A.R.S.") Sections 12-120.21(A)(1) and 13-4033(A)(1).

## DISCUSSION

**¶9**        Sicari raises numerous arguments challenging his convictions and sentences.  He argues the superior court erred in denying his request for the State to produce evidence relating to certain audio extractions and that the State improperly elicited testimony regarding his invocation of his Fourth Amendment rights.  He contends the superior court erred in excluding evidence necessary for him to present a complete defense and in permitting the State's "cold" expert to testify regarding "domestic violence abuser profile evidence."  Sicari further argues there was insufficient evidence to find Martha's ruptured ear drum constituted a serious physical injury and that the court erred in overruling his objection to the State's explanation of the dangerousness instruction in its closing argument.  He also argues his assault convictions for counts 2 and 4 violate double jeopardy.

I.   **The superior court did not err in declining to order the State to produce all extractions from Martha's phone and iPad.**

¶10         Sicari argues the State was required to disclose full extractions from Martha's phone and iPad, specifically, how the two phone call recordings were made, recordings of himself, the original files for the two recordings (including the raw data), Martha's call logs to compare call recordings with her statements, any other material or relevant data, communications between himself and Martha, and raw data from certain portions of the extractions. The State responds it disclosed everything it had lawful access to, and, in any event, Sicari and his expert were able to testify as to the veracity of the recordings at trial.

¶11         We review the superior court's ruling on discovery and disclosure matters for an abuse of discretion and defer to its factual findings provided they are supported by reasonable evidence. *State v. Bernini*, 220 Ariz. 536, 538, ¶ 7 (App. 2009).

¶12         As background, before trial, the State disclosed Martha's 17-minute recording (the "December 13 recording") of a phone call with Sicari, and later, a 12-minute and 40-second recording (the "December 14 recording") that Martha later found and disclosed. The Scottsdale Police Department ("SPD") extracted these recordings from her iPad after receiving Martha's permission to do so. Sicari moved to preclude the "nonoriginal audio recordings" because he believed they were altered. The State responded that they were "original recordings." In denying his motion, the court noted that the parties' experts would be allowed to present their competing theories about whether the recordings were altered, and the jury would properly determine those experts' credibility on the subject.

¶13         Sicari's expert reviewed one of the extracted recording files and opined that it "presented . . . a collection of at least **6 different recordings**, none of which are in their native format." The expert contended there was "no way of knowing **when** or **where** these were recorded, **how** they were recorded, the correct **context**, or **if they were edited to suit a narrative**."

¶14         Sicari then moved to compel disclosure of Martha's phone and iPad and the State's original extraction files, alleging Martha "edited and spliced together different recordings relevant to this case to create a false narrative and incriminate [him]." The State had previously argued the recordings were originals, but in response to Sicari's motion to compel,

acknowledged the SPD forensic technician accessed four additional files on Martha's phone that exceeded the scope of her consent. After listening to these files, the technician stated the first file "appeared to be a clipped portion" from one of the files already disclosed and the same for the second file. These fragments were identified as belonging to the December 14 recording, but nothing was located for December 13.

¶15        The State informed Sicari that Martha would consent to giving SPD access to the two "audio fragments" found in a different section of the device that the SPD forensic technician found. The court ordered both Sicari's and the State's experts to view the iPad "Cellebrite Extraction," and review audio recordings from December 13, 2022, to December 14, 2022, and voice memo recordings from December 13, 2022, to December 14, 2022. And in January 2025, the court ordered SPD to allow defense expert, Matt Erickson, or another USA Forensics employee to view Martha's iPad Cellebrite Extraction for audio media and memos, records, and voice memos from December 13, 2022, to December 14, 2022.

¶16        Sicari argued in his opening statement that the December 13 recording was not original and had been edited. He specifically contended that Martha "cut out" the portion of the recording when Sicari "did stick up for himself and said, none of this would have happened if you hadn't come at me with a knife." Martha testified that she did not stop the December 13 recording and that she directly uploaded it from her iPad via a link the police sent her. And after learning Sicari alleged the recording was edited, she allowed the SPD "to have access to [her] iPad to download [the] recording directly." She also testified that at no point did she alter or edit the December 14 recording.

¶17        Sicari now argues the "court erred in refusing to order the State to produce extractions of [Martha's] phone and i[P]ad," and that the State had possession of the extractions via SPD "as a matter of law." The State responds Martha only gave limited consent to extract certain content and that it could not exceed the scope of her consent. The State also claims it was not in possession of the extractions "by imputation" through SPD.

¶18        "There is no general federal constitutional right to discovery in a criminal case." *State v. Tucker*, 157 Ariz. 433, 438 (1988). The United States Constitution, however, imposes a due process obligation on the State to disclose exculpatory evidence material to the issues of guilt or punishment. *See id.* (citing *Brady v. Maryland*, 373 U.S. 83, 87-88 (1963) and *United States v. Bagley*, 473 U.S. 667, 676-84 (1985)). "Mere speculation that a government file may contain *Brady* material is not sufficient to require

. . . reversal for a new trial." *State v. Acinelli*, 191 Ariz. 66, 71 (App. 1997). The prosecutor's disclosure duty extends to "favorable evidence known to the others acting on the government's behalf." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

**¶19** Under Arizona Rule of Criminal Procedure ("Rule") 15.1(f)(2), "[t]he State's disclosure obligation extends to material and information in the possession or control of . . . any law enforcement agency that has participated in the investigation and is under the prosecutor's direction or control." And we have held "that a law enforcement agency investigating a criminal action operates as an arm of the prosecutor for purposes of obtaining information that falls within the required disclosure provisions of Rule 15.1." *Carpenter v. Superior Court*, 176 Ariz. 486, 490 (App. 1993); *see also State v. Mesa*, 203 Ariz. 50, 55, ¶ 21 (App. 2002) (a law enforcement agency acting in this capacity "operates as an arm of the prosecutor" for the purposes of Rule 15.1).

**¶20** Sicari is correct that the State's disclosure obligation generally extended to material in SPD's possession because it was a law enforcement agency that participated in the investigation of the case. Ariz. R. Crim. P. 15.1(f)(2); *Carpenter*, 176 Ariz. at 490. But even though SPD had the entire Cellebrite extraction in their possession, the State's access to the extraction was limited by the scope of Martha's consent. Our supreme court has acknowledged "that cell phones are 'minicomputers' that hold 'a digital record of nearly every aspect of [people's] lives,'" and "a warrant is generally required to search a cell phone." *State v. Lietzau*, 248 Ariz. 576, 579, ¶ 10 (2020) (citing *Riley v. California*, 573 U.S. 373, 393 (2014)). And here, there was no warrant permitting the State to search Martha's devices beyond the scope of her consent. The State did not have access to the entire Cellebrite extraction because there was no warrant to search Martha's cellphone and Martha only gave limited consent. Accordingly, there was no *Brady* violation.

**¶21** The court ordered Sicari's and the State's experts to view the iPad "Cellebrite Extraction," and view audio recordings from December 13, 2022, to December 14, 2022, and memos, records, and voice memo recordings from December 13, 2022, to December 14, 2022.

**¶22** Sicari contends that the additional evidence he sought within those extractions "was highly material" and that the State's case rested on Martha's testimony and the credibility of her testimony depended on that evidence. He also argues the State improperly withheld this evidence while also relying on it. But Sicari admitted that he had access to the call logs and

texts between him and Martha between December 10 and December 14. And his expert testified that the December 13 and December 14 recordings were edited. The State did not rely on or use the entirety of the Cellebrite extraction, as its access was limited to the audio files that Martha had given it access to.

**¶23** Further, Sicari was a party to the conversations in the recordings and free to testify about the alleged additional statements he made to Martha — and he, in fact, did testify about them. For example, Sicari testified that he said other things on the recordings that "clearly defend[ed] [himself]," that "[t]here was a lot of conversation about what really happened," and that Martha "selected the pieces that helped her." As the superior court noted in its initial ruling declining to order the State to produce the full extractions, the question of whether the recordings were edited in Martha's favor was a credibility issue for the jury to decide. And there was sufficient evidence for a reasonable jury to conclude that the recordings were not edited. *See State v. Williams*, 209 Ariz. 228, 231, ¶ 6 (App. 2004) (explaining the jury alone "weigh[s] the evidence and determine[s] the credibility of the witnesses"). Sicari's arguments are mere conjecture, and "without more that certain information may be useful" they are insufficient to justify reversal. *State v. Hatton*, 116 Ariz. 142, 150 (1977). We find no error.

## II. The State did not impermissibly comment on Sicari's refusal to allow SPD to conduct a warrantless search of his phone.

**¶24** Sicari argues the State violated his due process right to a fair trial when it introduced a statement he signed saying he did not consent to SPD searching his property absent a valid search warrant. He argues this "improperly suggest[ed] he had something to hide." The State argues it needed to rebut Sicari's claims that it had deleted material off his phone.

### A. Standard of Review

**¶25** Sicari contends he properly preserved his objection to the admission of his signed statement, even though he admits he did not object when the State first commented on his refusal to allow a warrantless search of his phone. The State contends Sicari failed to timely object to the admission of his consent form, and we should therefore review for fundamental error.

**¶26** "If a criminal defendant does not object to trial error when it occurs, the error is only reversable on appeal if it is 'fundamental' and prejudicial." *State v. Perez-Gutierrez*, 257 Ariz. 334, 336, ¶ 1 (2024); *State v.*

*Butler*, 230 Ariz. 465, 471, ¶ 21 (App. 2012) (requiring parties to make a "contemporaneous objection" to preserve an objection on the admissibility of evidence).  Because Sicari did not object at the time the State introduced the evidence, and only later objected after the alleged error occurred, we review for fundamental error.

### B. The State did not impermissibly comment on Sicari's invocation of his Fourth Amendment rights.

**¶27**        Generally, a prosecutor cannot use a defendant's invocation of his Fourth Amendment rights as evidence of substantive guilt.  *State v. Stevens*, 228 Ariz. 411, 417, ¶¶ 15-16 (App. 2012).  But "such evidence may be admitted as a fair response to a claim by the defendant or for some other proper purpose."  *Id.* at 417, ¶ 15 n.7 (citing *United States v. Dozal*, 173 F.3d 787, 794 (10th Cir. 1999)).

**¶28**        In *Stevens*, we held the court erred by allowing the State to introduce the defendant's invocation of her Fourth Amendment rights as direct evidence of guilt.  228 Ariz. at 417, ¶ 16.  There, the State presented testimony that if someone denied police access to her home, the responding officer would think "it means that there's something in there they don't want [the officer] to see."  *Id.* at 413, ¶ 3.  And in closing argument, the State argued the defendant's invocation of her Fourth Amendment rights was because "she knew what [the police] would find in her house," and that is why she denied police access to conduct a warrantless search.  *Id.* at 414, ¶ 4.

**¶29**        Conversely, here, the State used Sicari's refusal to allow SPD to conduct a warrantless search to impeach his assertions that the State destroyed evidence off his phone.  For example, Sicari's lawyer argued multiple times that the State "destroyed data off [Sicari's] phone" and he filed a "Notice That The Scottsdale Police Department Destroyed Relevant Data On Mr. Sicari's Iphone Needed By The Defense."  To rebut these claims, the State introduced Sicari's consent form permitting SPD to allow his attorney "to hire an expert to make a copy or clone of any and all evidence items belonging to [him] in the possession of [SPD]" but denying the SPD consent to search any of his property absent a valid warrant.

**¶30**        The State used this evidence to demonstrate that "the only people that are allowed to have the contents of the defendant's phone [were] the defendant, the defense expert, and the defense attorney."  And the State clarified that Sicari only provided the State selections of content downloaded from his phone. *See State v. Clark*, 2014 WL 7465658, No. 2 CA-

CR 2014-0041, at *4, ¶ 4 (Ariz. App. Dec. 30, 2014) (mem. decision) (holding that "refusal evidence may be admissible to respond to a claim by the defendant regarding, for example, police misconduct"). Accordingly, we find no error, fundamental or otherwise, because the State did not use Sicari's invocation of his Fourth Amendment rights as substantive evidence of his guilt.

### III. The superior court did not err in its evidentiary rulings regarding Sicari's request to admit evidence of Martha's prior acts and his objection to the State's expert testimony on domestic violence.

**¶31**         We review rulings on the admissibility of evidence for an abuse of discretion but review alleged constitutional violations de novo. *State v. Foshay*, 239 Ariz. 271, 279, ¶ 34 (App. 2016).

### A.      Sicari's Victim Prior Act Evidence

**¶32**         Prior to trial, Sicari requested to testify as to his state of mind the night of the incident based on Martha's alleged prior acts, which he claims resulted in him (1) getting shot, (2) fired, (3) evicted, and (4) losing clients. The superior court denied his request.

**¶33**         Sicari again sought to introduce this evidence at trial to show his state of mind during the December 13 recording. The superior court denied his request, reasoning that any probative value of the alleged acts outweighed the "substantial" danger of confusing the jurors.

**¶34**         Sicari now contends the court's denial violated his constitutional right to present a complete defense. And he argues the court incorrectly applied the Arizona Rules of Evidence 404 and 405 frameworks to determine whether his evidence was admissible. The State agrees with Sicari that the court misapplied Rule 404(b)'s clear and convincing standard to Martha's prior acts[2] but argues it does not matter because the court's Rule 403 analysis was dispositive and provided a proper avenue to preclude the evidence.

**¶35**         We start with the court's Rule 403 analysis because it is dispositive. *See Fish*, 222 Ariz. at 123, ¶ 43 (requiring that the probative

---

[2] We need not address the disparate burdens applied by Division One and Two when determining whether a victim's prior acts are admissible under Rule 404(b). *Compare State v. Fish*, 222 Ariz. 109, 123, ¶ 43 (App. 2009) (applying a clear and convincing evidence burden to prior act evidence of the victim) *with State v. Parkinson*, 258 Ariz. 601, 607, ¶ 18 (App. 2024).

value of prior act evidence must not be substantially outweighed by undue prejudice under Rule 403). Rule 403 provides that the court may exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury," etc. Ariz. R. Evid. 403. The "trial court is in the best position to balance the probative value of challenged evidence against its potential for unfair prejudice," and therefore "has broad discretion in this decision." *State v. Connor*, 215 Ariz. 553, 564, ¶ 39 (App. 2007) (citation omitted).

**¶36** Here, the court did not abuse its discretion in making its Rule 403 finding. First, Sicari conceded that Martha's alleged prior acts had "nothing to do with conduct[;]" their purpose was to explain his statements in the December 14 recording; and "[o]ther than that, there [was] absolutely no relevance" to his defense. In other words, Sicari tried to introduce evidence that was not "very similar" to the events at issue and, as the superior court correctly reasoned, had no bearing on the charges he was facing, *i.e.*, no probative value, but had a substantial danger of confusing the jury.

**¶37** Further, Sicari testified over multiple trial days as to his state of mind during the December 13 recording and the reasoning behind his attempts to "placate" Martha on the call. For example, he explained that Martha would call and berate him. He had tried running, staying with friends, and going to hotels, but Martha would still find him and "burn[] things down until she got what she wanted." And he "had no luck running, hiding, begging,[or] threatening her to stay away," so if she said he was a monster during the phone call, then he simply went along with it. His motive for being a "monster" was to "keep her away from [him]."

**¶38** And, despite the court's ruling excluding Martha's alleged prior acts, Sicari testified about some of them—namely, that she got him fired and he described her "fak[ing] one of her kidnappings" (which led to his arrest) twice during his testimony. Sicari's claim that Martha "got him shot" was introduced to the jury through Detective Myer's testimony when he quoted Sicari's police interview.

**¶39** Further, we agree Sicari's proffered prior act evidence would have created a substantial danger of unfair prejudice. The superior court correctly noted that "[s]pecific act evidence tends to arouse prejudice, to confuse, to surprise[,] and to consume time." *See State v. Lehman*, 126 Ariz. 388, 391 (App. 1980). Sicari was charged with kidnapping, three counts of aggravated assault, and preventing the use of a telephone in an emergency.

We agree with the superior court that the prior act evidence that Martha allegedly got him shot, evicted, and caused him to lose clients would result in a substantial likelihood of confusing the jury about the charges at issue. And, in any event, as mentioned, Sicari still told the jury about several of them.

**¶40**     We are unpersuaded that any error in the court's Rule 404(b) analysis corrupted its Rule 403 analysis. Even assuming the court applied the wrong burden under Rule 404(b), which we do not address, any error was harmless because the court properly excluded the evidence under Rule 403.

> **B.    The superior court did not err in admitting the "cold" expert testimony on domestic violence.**

**¶41**     Sicari argues the superior court fundamentally erred by permitting Dr. Bonomi's testimony because the State invited the jury to infer guilt based on Dr. Bonomi's testimony regarding specific domestic abuser characteristics.

**¶42**     The State presented "cold" expert Dr. Bonomi at trial, who testified generally regarding domestic violence victim behavior. She testified that she knew nothing about the specifics of this case but generally explained why victims may act counterintuitively while in this type of relationship. A "cold" expert "educates the trier of fact about general principles but is not tied to the particular facts of the case." *State v. Salazar-Mercado*, 234 Ariz. 590, 595, ¶ 21 (2014).

**¶43**     Because Sicari did not object to Dr. Bonomi's testimony, we review for fundamental error. *State v. Miller*, 234 Ariz. 31, 36, ¶ 7 (2013). Under fundamental error review, Sicari carries the burden to show error exists, the error is fundamental, and the error caused him prejudice. *See State v. Escalante*, 245 Ariz. 135, 142, ¶ 21 (2018). An error is fundamental if it (1) goes to the "foundation of the case," (2) deprives the defendant of "a right essential to his defense," or (3) is "so egregious that [the defendant] could not possibly have received a fair trial." *Id.* If a defendant establishes fundamental error, he must show prejudice by establishing that "a reasonable jury could have plausibly and intelligently returned a different verdict" absent the error. *Id.* at 144, ¶ 31.

**¶44**     "Profile evidence tends to show that a defendant possesses one or more of an informal compilation of characteristics or an abstract of characteristics typically displayed by persons engaged in a particular kind of activity." *State v. Ketchner*, 236 Ariz. 262, 264, ¶ 15 (2014) (citations

omitted). It "is offered to implicitly or explicitly suggest that *because* the defendant has those characteristics, a jury should conclude that the defendant must have committed the crime charged." *State v. Haskie*, 242 Ariz. 582, 585-86, ¶ 14 (2017). "[P]rofile evidence may not be used as substantive proof of guilt because of the risk that a defendant will be convicted not for what he did but for what others are doing." *Ketchner*, 236 Ariz. at 264, ¶ 15 (citation omitted).

**¶45** Expert testimony explaining "a victim's seemingly inconsistent behavior is admissible" to help jurors evaluate the victim's credibility. *Haskie*, 242 Ariz. at 586, ¶ 16. But expert testimony that describes or refers to a perpetrator's characteristics is not categorically admissible. *Id.* Such evidence must be relevant, and its admission must not substantially outweigh its probative value. *Id.* at ¶¶ 16-17.

**¶46** Sicari cites *Ketchner*, 236 Ariz. at 265, ¶ 19, to argue "the expert overstepped the bounds of permissible 'cold' expert testimony by explaining not just victim behavior, but also how an abuser would react to loss of control." *Ketchner* is distinguishable because the victim's potentially inconsistent behavior was not at issue, and "the nature of [the victim's] abuse relationship with [the defendant] was uncontested." 236 Ariz. at 465, ¶ 19. And the "evidence did not explain behavior by [the victim] that otherwise might be misunderstood by a jury; indeed, the nature of her abusive relationship with [the defendant] was uncontested." *Id.*

**¶47** Our supreme court clarified that in *Ketchner*: "the victim's actions were not at issue and the expert's testimony did not explain victim behavior . . . [i]n other words, the expert testimony in *Ketchner* was simply not relevant to explaining the victim's behavior." *Haskie*, 242 Ariz. at 586-87, ¶ 19. Although it is true that "the more the testimony is tied to the defendant's characteristics, rather than to those of the victim, the more likely the admission of such testimony will be permissibly prejudicial," the decision on "whether expert testimony will aid the jury" is "generally a fact-bound [inquiry] uniquely within the competence of the trial court," that varies from case to case. *Id.* at 586, ¶ 18.

**¶48** In *Haskie*, our supreme court held expert testimony did not constitute impermissible profile evidence because the expert testimony "was not directed at establishing that [the defendant] possessed 'one or more of an informal compilation of characteristics' typically displayed by domestic violence abusers; rather, it was introduced to explain the impetus for the victim's counterintuitive behavior." *Id.* at 587, ¶ 22. Although some evidence reflected characteristics of domestic violence abusers described by

the expert, the court noted that "just because expert testimony about behavioral characteristics is exceedingly persuasive does not mean it is *unfairly* prejudicial." *Id.*

**¶49** Conversely, here, Martha's counterintuitive behaviors were at issue, and the State used Dr. Bonomi's testimony to clarify Martha's behaviors, *i.e.*, her actions in contacting Sicari post-incident and her initial reluctance to come forward about what occurred. "This evidence [explained] behavior by [Martha] that otherwise might be misunderstood by a jury . . . ." *Ketchner*, 236 Ariz. at 265, ¶ 19. Dr. Bonomi clarified she was testifying as a "cold" expert, meaning she did not know the details of the case. She explained that domestic violence might present as physical violence or intimidation. She further explained that victims do not always immediately come forward to the police and sometimes return to their abuser. And in the State's opening statement, it clarified that Dr. Bonomi would "explain the counterintuitive behavior that domestic violence victims often exhibit . . . [and] why they respond to trauma in different ways, and why they may continue to love their abuser."

**¶50** Sicari challenges the State's statement in closing argument that Dr. Bonomi "testified so that when everyone else testified on that stand, [the jury would] have it in [their] brain, oh, this is what Dr. Bonomi said would happen." But immediately following this statement, the State clarified it wanted the jury to know Dr. Bonomi's testimony helped explain Martha's actions and why she was reluctant to come forward. The court also instructed the jury that it was not bound by expert testimony, it could accept the expert testimony in whole or in part.

**¶51** Sicari tries to analogize his case to *Escalante*, arguing Dr. Bonomi's testimony was impermissible profile evidence that "went to the foundation of the State's case." *Escalante* is distinguishable because there, the expert's "testimony was only relevant to demonstrate that [the defendant's] behaviors were consistent with drug trafficking." *Escalante*, 245 Ariz. at 143, ¶ 24. In other words, the drug-courier profile evidence went to the underlying charges.

**¶52** Here, the purpose of Dr. Bonomi's testimony was to generally explain a domestic violence victim's behavior, such as why a victim would continue to communicate with their abuser and delay in reporting. Sicari has not shown error, let alone prejudicial, fundamental error.

**IV.** **There was sufficient evidence for the jury to find Martha's ruptured eardrum constituted a serious physical injury under Section 13-1204(A)(1).**

¶53     Sicari argues there was insufficient evidence that Martha suffered a "serious physical injury" because no medical evidence supported her claim and the injury would heal on its own.

¶54     We review de novo whether there is sufficient evidence to support a conviction. *State v. West*, 226 Ariz. 559, 562, ¶ 15 (2011). Further, "we test the evidence against the statutorily required elements of the offense," and "do not reweigh the evidence to decide if [we] would reach the same conclusions as the trier of fact." *State v. Dodd*, 244 Ariz. 182, 185, ¶ 8 (App. 2017).

¶55     "[A] person commits aggravated assault if the person commits assault . . . [and] causes serious physical injury to another." A.R.S. § 13-1204(A)(1). A serious physical injury is one "that creates a reasonable risk of death, or that causes serious and permanent disfigurement, serious impairment of health or loss or *protracted impairment* of the function of any bodily organ or limb." A.R.S. § 13-105(39) (emphasis added).

¶56     The State presented evidence that Sicari's repeated kicking of Martha's face and back of her head ruptured her eardrum. The assault left Martha temporarily deaf in her right ear. Her ruptured ear drum caused balance issues, and by the time of trial over two years later, she still did not have full hearing in her right ear. Based on this evidence, the jury could use "their collective common sense" to reasonably conclude Martha's ruptured eardrum was a "protracted impairment." *See Dodd*, 244 Ariz. at 186-87, ¶ 16 (upholding a jury verdict for aggravated assault under Section 1204(A)(1) where the victim suffered a broken and dislocated femur and hip socket that required surgery).

¶57     Sicari's reliance on *State v. George* to argue Martha's eardrum does not constitute a "protracted impairment" is misplaced. 206 Ariz. 436 (App. 2003). In *George*, we considered whether there was sufficient evidence for the jury to convict the defendant of aggravated assault for causing serious physical injury to the victim. *Id.* at 441, ¶ 8. We reasoned that the State failed to present evidence that the victim's injuries resulting from a shot in the neck caused protracted impairment of the use of her arm. *Id.* at 442, ¶ 14. There, the State's only expert was a physician who testified that "[h]e refused to speculate on how long [the victim] might have continued to suffer such impairment." *Id.* at 440, ¶ 4. *George* is

distinguishable because here, the State presented evidence about the severity of Martha's eardrum injury and the duration of the impairment. The State presented sufficient evidence that Sicari's assault resulted in a protracted impairment to Martha's eardrum that supported Sicari's conviction for aggravated assault by causing a serious physical injury.

**V.      Any error resulting from the State's mischaracterization of the intent required for a dangerousness finding under Section 13-105(13) in its closing argument was harmless.**

**¶58**      Sicari contends the superior court erred in overruling his objection to the State's characterization of dangerousness in its closing argument during the aggravation phase.

**¶59**      "We review the trial court's ruling on the scope of closing argument for an abuse of discretion." *State v. Pandeli*, 215 Ariz. 514, 525, ¶ 30 (2007). Because Sicari objected to this issue at trial, we review for harmless error. *Perez-Gutierrez*, 257 Ariz. at 339, ¶ 18.

**¶60**      Prosecutors have "wide latitude in presenting their closing arguments to the jury." *State v. Jones*, 197 Ariz. 290, 305, ¶ 37 (2000). When determining whether closing arguments constitute prosecutorial error, we consider whether the remarks "called to the jury's attention matters it should not have considered in reaching its decision" and "the probability that the jurors were in fact influenced by the remarks." *State v. Smith*, 250 Ariz. 69, 100, ¶ 144 (2020).

**¶61**      The jury convicted Sicari of Section 13-1204(A)(1) assault as to count 3. Sicari acknowledges the court properly instructed the jury that for the purposes of count 3, "a dangerous offense is an offense involving the intentional or knowing infliction of serious physical injury on another person." *See* A.R.S. § 13-105(13) (defining a dangerous offense as one "involving the discharge, use or threatening exhibition of a deadly weapon or dangerous instrument or the intentional or knowing infliction of serious physical injury on another person").

**¶62**      Sicari challenges the State's statement during closing argument that "[t]he definition of intentionally is the person's objective is to cause the result or engage in the conduct. It's the conduct. This is this conduct, not the busted eardrum that results . . . [y]ou have to intend to engage in the conduct."

**¶63**      Here, even assuming error, it was harmless. The court properly instructed the jury that the attorneys' closing arguments are not

15

evidence but may help the jury understand the law and evidence. Indeed, the court noted at sentencing that the jury was properly instructed regarding this issue. And we presume the jurors followed the court's instructions. *See State v. Ramirez*, 178 Ariz. 116, 127 (1994).

**¶64** Further, there is no reasonable likelihood the State's closing argument about the intent requirement for a dangerousness finding under Section 13-105(13) could have affected the jury's verdict. *See State v. Newell*, 212 Ariz. 389, 403, ¶ 67 (2006); *see also State v. Ramos*, 235 Ariz. 230, 238, ¶ 30 (App. 2014). Sicari testified he hit Martha three times, "as hard as [he] could," he "got control of her," and "pop[ped] her hard," grinding her head into the ground. Martha testified that after she was on the ground, he kicked her on the head, then got on top of her and banged her head on the tile. Any error was therefore harmless.

## VI. Sicari's assault convictions do not violate double jeopardy.

**¶65** Sicari argues the jury verdicts on the lesser-included offenses of assault in counts 2 and 4 violated double jeopardy. In support, he argues "[t]here is no distinction between the two convictions" because both offenses occurred "on the same date and during the same incident."

**¶66** Sicari failed to raise this issue at trial, so we review for fundamental error. *Miller*, 234 Ariz. at 36, ¶ 7. "A conviction or sentence that violates the Double Jeopardy Clause constitutes fundamental error." *State v. Jurden*, 239 Ariz. 526, 528, ¶ 7 (2016).

**¶67** "The Double Jeopardy Clause protects against multiple punishments for the same offense." *Jurden*, 239 Ariz. at 529, ¶ 10. "[I]f multiple violations of the same statute are based on the same conduct, there can only be one conviction if there is a single offense." *Id.* at ¶ 11. "[T]he statutory definition of the crime determines the scope of conduct for which a discrete charge can be brought, which the United States Supreme Court has referred to as the allowable unit of prosecution." *Id.* (citation omitted).

**¶68** Sicari was convicted under Section 13-1203(A)(2) on counts 2 and 4. Under this section, "a person commits assault by . . . [i]ntentionally placing another person in reasonable apprehension of imminent physical injury." A.R.S. § 12-1203(A)(2). "The minimum requirement for criminal liability is the performance by a person of conduct which includes a voluntary act . . . ." A.R.S. § 13-201. An "act" is defined as "a bodily movement." A.R.S. § 13-105(2).

**¶69**      The language of Section 13-1203(A)(2) indicates that the unit of prosecution is a bodily movement taken with one of the requisite mental states that results in any physical injury.  Here, the jury convicted Sicari of two counts of assault after hearing testimony that Sicari both strangled Martha and then asked her to move to the couch, where he held a gun to her head and threatened her.  Because these convictions are based on separate, voluntary, bodily movements resulting in Martha being in apprehension of imminent physical injury, they do not violate double jeopardy.  *See State v. Chacon*, 2017 WL 930804, No. 1 CA-CR 15-0403, at *2, ¶ 13 (Ariz. App. Mar. 9, 2017) (mem. decision).

## CONCLUSION

**¶70**      We affirm.

