NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

TIFFANY WOODS, *Appellant*.

No. 1 CA-CR 21-0188
FILED 6-30-2022

Appeal from the Superior Court in Navajo County
No. S0900CR201800422
The Honorable Ralph E. Hatch, Judge (Retired)

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Joshua C. Smith
*Counsel for Appellee*

The Lara Group PC, Mesa
By Matthew Lara
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Presiding Judge Jennifer B. Campbell delivered the decision of the Court, in which Judge Randall M. Howe and Judge James B. Morse Jr. joined.

---

**C A M P B E L L**, Judge:

¶1        Tiffany Woods appeals her convictions and sentences for multiple drug-related crimes. For the following reasons, we affirm.

**BACKGROUND[1]**

¶2        A confidential informant (CI) contacted the police and offered to set up a drug buy with a dealer—Woods. A detective with the police drug task force and two other law enforcement officers picked the CI up, questioned him regarding the details of the buy, searched his person for contraband, outfitted him with an audio-recording device, gave him money, and observed as he called and text-messaged with Woods on his cell phone (through the Facebook Messenger app). The officers then drove him to the arranged location—a local fast-food restaurant parking lot. When the CI got out of their vehicle, the law enforcement officers watched him as he sat on a bench outside the restaurant for several minutes and then got into a white SUV, occupied by a male driver and a male front-seat passenger.  Once the CI entered the SUV, loud music prevented the officers from hearing any conversation through the "live feed" of the audio-recording device. The officers visually monitored the CI, however, and followed the SUV to another fast-food restaurant where they saw the CI get out of the vehicle.

¶3        With the transaction completed, the officers picked up the CI, debriefed him, searched his person, retrieved drugs and the recording device, and learned that Woods' husband (in the presence of a third party), not Woods, had completed the sale. Nonetheless, based on Woods' role in arranging the sale, as well as her subsequent communications with the CI, law enforcement officers obtained a search warrant to retrieve her private Facebook communications.

---

[1]    We view the facts in the light most favorable to sustaining the verdicts. *State v. Payne*, 233 Ariz. 484, 509, ¶ 93 (2013).

¶4 After the officers reviewed the Facebook documents, and forensic testing confirmed that the CI received methamphetamine during the drug buy, the State charged Woods with one count of participating in a criminal syndicate (Count 1), one count of illegal control of an enterprise (Count 2), one count of illegally conducting an enterprise (Count 3), one count of sale of a dangerous drug (Count 4—CI), and seven counts of offering to sell a dangerous drug (Counts 5 through 11—as reflected in the Facebook documents). The State also alleged aggravating circumstances.

¶5 Without objection, the State tried Woods in absentia. At trial, the detective testified that he monitored the CI's cell phone as he contacted Woods to set up the drug buy. The detective explained that the CI's cell phone identified the recipient of the call and messages as Woods, both by name and by photograph. The detective testified that, after her arrest, he recognized Woods as the woman pictured in the cell phone's photograph and recognized her voice as the female voice from the cell phone call.

¶6 The CI also testified, describing his frequent communications with Woods through the Facebook Messenger app and explaining that he recognized both her voice and manner of speaking. While he and Woods had a relationship, the CI testified that at some point, he received threats and "felt [his] life was in danger," so he approached the police to enter an informant agreement. Although Woods' husband completed the drug transaction, the CI testified that Woods, not her husband, was "top dog" in their drug operation.

¶7 During the CI's testimony, the superior court admitted two exhibits that contained communications from Woods' Facebook account. The first exhibit (Exhibit 2) consisted of messages between Woods and the CI, exchanged after the drug buy, reflecting multiple offers (by Woods) to sell drugs, and the second exhibit (Exhibit 5) consisted of messages exchanged between Woods and another would-be buyer (Nelson).

¶8 After a three-day trial, a jury found Woods guilty of Counts 1, 3, 4, 5, 6, 10, and 11 and not guilty of the remaining counts. The jury also found at least one aggravating factor for each of the convictions. When authorities later apprehended Woods, the superior court sentenced her to concurrent terms of imprisonment for a total of eight years. Woods timely appealed.

## DISCUSSION

¶9 As her sole issue on appeal, Woods contends that the superior court improperly admitted Exhibits 2 and 5. She argues that the State failed

to lay sufficient foundation to authenticate the exhibits and asserts that the records were incomplete.

**¶10**        We review evidentiary rulings for a clear and prejudicial abuse of discretion. *State v. Ayala*, 178 Ariz. 385, 387 (App. 1994); *see also State v. George*, 206 Ariz. 436, 446, ¶ 28 (App. 2003) ("Whether a party has laid sufficient foundation for the admission of evidence is within the sound discretion of the [superior] court, and we will not disturb its ruling absent a clear abuse of that discretion."). A court abuses its discretion when the reasons given for its decision are clearly untenable, legally incorrect, unsupported by the record, or otherwise amount to a denial of justice. *State v. Gentry*, 247 Ariz. 381, 385, ¶ 14 (App. 2019); *State v. Cowles*, 207 Ariz. 8, 9, ¶ 3 (App. 2004).

**¶11**        Before impaneling a jury, the superior court broached the Facebook documents with the attorneys. During the ensuing discussion, defense counsel stipulated to the admission of the Facebook messages exchanged between Woods and the CI. Defense counsel objected, however, to the admission of the other Facebook messages, allegedly exchanged between Woods and Nelson, on foundation and hearsay grounds. Given defense counsel's split positions, the prosecutor offered to present the documents in separate exhibits, and the court admonished the prosecutor that he needed to "lay the foundation" before introducing the messages exchanged between Woods and Nelson.

**¶12**        As part of his opening statement, defense counsel told the jurors that "there [wa]s a proper foundation" for admitting Woods' Facebook messages with the CI. Consistent with his opening statement, defense counsel did not object when the detective testified that he observed the CI contact Woods through the Facebook Messenger app. Despite his prior stipulation and assurances, however, defense counsel objected on foundation grounds when the prosecutor presented Exhibit 2 to the detective and asked him to identify its contents. In response to defense counsel's foundation objection, the prosecutor elicited testimony from the detective explaining the function of the Facebook Messenger app and reiterating that he heard the CI's phone call with Woods and saw the CI's cell phone when he messaged Woods.

**¶13**        Later, defense counsel did not object when the CI testified that he recognized Woods' voice and manner of speaking and identified the documents in Exhibit 2 as his messages with Woods via Facebook Messenger. When the prosecutor moved to admit Exhibit 2, however, defense counsel objected on grounds of incompleteness, noting that the

exhibit did not include messages exchanged between Woods and the informant on the date of the drug buy, and arguing that absent all their communications, the messages contained in the exhibit "are out of context." In response, the prosecutor avowed that he had omitted nothing from the communications contained in Exhibit 2 and averred that he could not submit the CI's earlier messages with Woods because he did not "have those Facebook documents." After hearing from the attorneys, the superior court admitted Exhibit 2, finding the prosecutor had "laid the foundation" for the exhibit and that defense counsel's charge of incompleteness presented a jury question concerning the weight to accord the evidence, not a question as to its admissibility.

¶14            At that point, the attorneys debated the admissibility of Exhibit 5, with defense counsel asserting that the CI's ability to recognize Woods' "flowery," "seductive," and "lovey-dovey" writing style in communications *to him* did not transfer to her purported messages with Nelson. Absent that "sweet" language, defense counsel contended that the CI could not testify that Woods, rather than her husband, had authored the messages. In response, the prosecutor argued that the CI's familiarity with Woods' manner of speaking provided a sufficient basis for him to identify Woods as the author of the messages contained in Exhibit 5. In a contingent ruling, the superior court found Exhibit 5 admissible if the prosecutor laid sufficient "foundation as to style"—demonstrating that the CI could recognize Woods' manner of speaking generally, not only when she used flirtatious language.

¶15            After publishing Exhibit 2 to the jury, the prosecutor had the CI review individual messages he exchanged with Woods. During this part of his direct examination, the CI explained the meaning of numerous peculiar and/or shorthand phrases that Woods used in her messages. Once the informant finished reviewing his own messages with Woods, the prosecutor asked him to determine whether the messages in Exhibit 5 were consistent with Woods' manner of speaking. Reiterating that he "kn[e]w how [Woods] talk[ed]," the informant opined that Woods authored the communications in Exhibit 5 as well, specifically pointing to the near "identical" language in messages sent to him and Nelson, just minutes apart. At that point, the State moved to admit Exhibit 5, identifying it as communications between Woods and Nelson. The superior court noted defense counsel's earlier objection and admitted Exhibit 5 into evidence over the defense objection. The prosecutor then walked the CI through multiple messages contained in Exhibit 5 and elicited testimony that the phrasing and language used was "consistent" with the informant's "understanding" of Woods' personality and manner of speaking.

¶16 We first consider Woods' claim that the exhibits are incomplete under Arizona Rule of Evidence (Rule) 106 and therefore inadmissible. The "rule of completeness" provides that "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction . . . of any other writing or recorded statement—that in fairness ought to be considered at the same time." Ariz. R. Evid. 106. But rather than having a preclusive effect, as urged by Woods, Rule 106 is "a rule of inclusion." *State v. Johnson*, 247 Ariz. 166, 200, ¶ 128 (2019) (quoting *State v. Steinle*, 239 Ariz. 415, 418, ¶ 10 (2016)). In fact, as made clear by our supreme court, Rule 106 does not "direct the exclusion of evidence in *any* circumstance." *Steinle*, 239 Ariz. at 418, ¶ 10 (emphasis added).

¶17 When defense counsel challenged the completeness of Exhibit 2 at trial, noting that the exhibit did not include any communications between Woods and the CI on the day of the drug buy, the prosecutor explained that those communications predated the Facebook records seized pursuant to the search warrant. The prosecutor also explained that he had no additional Facebook records in his possession. While acknowledging that Exhibit 2 did not contain all communications between Woods and the CI, the prosecutor also pointed out that the exhibits contained only complete, not fragmented, conversations—a point defense counsel did not meaningfully contest. This record provides no basis to find that either exhibit contained only "part of a writing or recorded statement," and Rule 106 provided no basis for excluding them.

¶18 Next, we turn to Woods' contention that the exhibits lacked sufficient foundation and authentication. A defendant's social media communications are admissible as statements of an opposing party under Rule 801(d)(2) if the State authenticates the writings. *State v. Griffith*, 247 Ariz. 361, 365, ¶¶ 13-14 (App. 2019). To satisfy the authentication requirement, a "proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Ariz. R. Evid. 901(a). "[T]his standard is satisfied if the evidence can be identified by its distinctive characteristics taken in conjunction with the circumstances of the case." *George*, 206 Ariz. at 446, ¶ 30 (citing Ariz. R. Evid. 901(b)(4)). In fact, a party may rely solely upon circumstantial and corroborating evidence, as well as the piece of evidence itself, to establish authenticity. *See State v. Lavers*, 168 Ariz. 376, 388 (1991).

¶19 "To be clear, the proponent need not definitively establish authorship—that is a question for the jury to resolve. Instead, such a statement may be admitted if reasonable extrinsic evidence tends to show

the party made it." *Griffith*, 247 Ariz. at 365, ¶ 15 (internal citation omitted). "Accordingly, foundation is sufficient when supported by '[t]estimony that a matter is what it is claimed to be.'" *State v. Damper*, 223 Ariz. 572, 576-77, ¶ 18 (App. 2010) (quoting Ariz. R. Evid. 901(b)(1)). Once the evidence is admitted, the opponent may still contest its authenticity, but the weight to be given the evidence becomes a question for the trier of fact. *State v. Irving*, 165 Ariz. 219, 223 (App. 1990).

**¶20**         Applying these principles here, the State presented sufficient evidence to support a finding that the Facebook documents are authentic, that is, that Woods authored the communications contained in both exhibits. Although not dispositive, law enforcement officers obtained the records from Facebook via a search warrant that confirmed the messages were associated with Woods' account. More importantly, the CI testified that all the communications, in both Exhibits 2 and 5, reflected Woods' particular manner of speaking. *See, e.g., Griffith*, 247 Ariz. at 364 (explaining a party seeking to admit a text message must "provide some indicia of authorship to satisfy its authentication obligation") (internal quotation omitted)); *Damper*, 223 Ariz. at 577, ¶ 19 (concluding sufficient evidence existed to authenticate a text message as sent from a certain individual based on the recipient's testimony that she often communicated with that individual by text message, had saved the individual's cell phone number in her own cell phone, denominated by a nickname, and when the text message at issue arrived, her phone displayed that nickname as the sender of the message); *United States v. Browne*, 834 F.3d 403, 415 (3d Cir. 2016) (holding Facebook messages are admissible as statements by a party opponent when sufficient evidence shows the defendant sent the messages); *United States v. Barnes*, 803 F.3d 209, 217 (5th Cir. 2015) (concluding the government laid sufficient foundation to support the admission of the defendant's Facebook messages upon a witness testifying that she had seen the defendant using Facebook and that she recognized his Facebook account as well as his style of communicating).

**¶21**         Given that evidence, a jury could reasonably find that Woods authored the communications. Although defense counsel argued that Woods' husband may have had access to her Facebook account and written the messages, "any uncertainty" about the messages' "authorship went to the weight of the evidence, not [their] admissibility." *George*, 206 Ariz. at 446, ¶ 31. Accordingly, the superior court did not abuse its discretion by admitting the Facebook records contained in Exhibits 2 and 5.

**CONCLUSION**

¶22     For the foregoing reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED:    AA