NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

KENNETH JOSEPH CARTER, *Appellant.*

No. 1 CA-CR 25-0412

FILED 06-09-2026

Appeal from the Superior Court in Mohave County
No.  CR-2024-00961
The Honorable Lee F. Jantzen, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Eliza C. Ybarra
*Counsel for Appellee*

The Law Offices of Robert Casey, Phoenix
By Robert I. Casey
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Presiding Judge Daniel J. Kiley delivered the decision of the Court, in which Judge D. Steven Williams and Judge Cynthia J. Bailey joined.

---

**K I L E Y**, Judge:

¶1 Kenneth Joseph Carter appeals his conviction and sentence for second-degree murder. Because he has failed to establish error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2 Viewing the facts in the light most favorable to upholding the conviction, *State v. Griffin*, 250 Ariz. 651, 653, ¶ 2 (App. 2021), the record shows that after moving to Arizona in 2017 or 2018, Carter began working for a construction company owned by "Dennis."[1] Carter and Dennis became friends, and Dennis allowed Carter and his girlfriend Kelsey Newbeck to stay in a trailer on property in Golden Valley (the "Property") where Dennis served as caretaker. Dennis lived in a house on the Property, while several others, including two unrelated people with the same last name, Angela Smith and Brandon Smith, lived in trailers.

¶3 In late May or early June 2024, Newbeck and Carter ended their relationship. Dennis allowed Newbeck to move into his house and, within a month or two, the two began a romantic relationship. Carter, meanwhile, moved off the Property into his father's home.

¶4 On August 1, Dennis and Newbeck visited a friend's house for dinner. While there, they smoked methamphetamine. Meanwhile, Angela and Brandon were driving somewhere else when their vehicle broke down. One of them called Dennis for help. Dennis and Newbeck left their friend's house to find Angela and Brandon and tow their vehicle back to the Property. The four arrived back at the Property at about midnight, and Dennis and Newbeck went inside the house.

¶5 Once inside, Newbeck looked at the live feed of the Property's security camera system and saw a truck driving "real slow" along "the dirt

---

[1] We use a pseudonym to protect the victim's identity. *See* Ariz. R. Crim. P. 31.10(f).

road" leading to the Property. The truck pulled up to the back gate and stopped. Newbeck alerted Dennis, who called Brandon to ask him if he knew who was in the truck. Brandon, who was still with his vehicle, called out to the truck's occupants and asked them to identify themselves. No one answered. Brandon informed Dennis that he had received no response. Dennis grabbed a pistol and left the house to investigate. A short time later, Newbeck followed him outside.

¶6        The truck's occupants, Carter and his father, got out as Dennis approached them. As Newbeck later testified, Carter was holding an AR-15 while his father was holding "something metal in his hand" that "could have been" a "crowbar." Dennis told them that they were "trespassing" and directed them to "get out of here." Newbeck heard either Carter or his father ask, "Where's my money?", a reference to a debt that Dennis apparently owed them. By now, Newbeck had joined the men, and Carter asked her to leave the Property with him. She refused.

¶7        Carter's father threw a punch at Dennis. Dennis "jumped back[,]" then fired a "warning shot" at the ground and "yelled" at Carter and his father to leave. Carter then "push[ed]" Dennis. At that point, Dennis turned and began walking back toward his house.

¶8        Carter's father stated, "Shoot him, Kenny. Shoot him now." Carter fired several times at Dennis, who collapsed on the ground. Within minutes, Dennis was dead. Meanwhile, Carter and his father fled the Property.

¶9        Upon arrival at the scene, investigators located one 9mm shell casing, a 9 mm pistol, and seven .223 casings.

¶10        Carter turned himself in to the police later that day. He admitted to shooting Dennis, and said that he threw the AR-15 out the window of his car while driving away from the scene. The gun was never recovered.

¶11        An autopsy revealed that Dennis had methamphetamine, amphetamine, and tetrahydrocannabinol ("THC"), a metabolite of cannabis, in his system at the time of his death.

¶12        In August 2024, a grand jury indicted Carter on one count of second-degree murder, a class 1 felony in violation of A.R.S. § 13-1104(A)(1).

¶13        A four-day jury trial began in August 2025.

3

¶14        During jury selection, the trial court allowed the prosecutor and defense counsel to present "mini-opening statements." *See* Ariz. R. Crim. P. 18.5(e). During his mini-opening statement, the prosecutor stated that Carter was charged with shooting and killing Dennis during an argument, and that "[t]he defendant is claiming self-defense." The prosecutor went on to state,

> [Y]ou'll hear from the medical examiner that [the victim] had methamphetamine in his system. . . . [Y]ou may hear from other witnesses . . . that . . . there's persons involved in this case that have used or have drug addictions. Now there's some people that don't accept that, that don't want to be a part of that. They can't be fair and impartial because they think that for whatever reason that's just something that they can't get past. So if that's going to be an issue, that's something we'd ask you to let us know.
>
> * * *
>
> [T]hese may not be people that you'd have over to dinner. . . . If that's something that you think will be an issue, please let us know. Because the law protects everyone; whether you like them or not, whether you'd have them for dinner or not, whether they have used drugs or not.

¶15        The defense made no objection to these statements during the prosecution's mini-opening statement. Indeed, Carter's counsel made similar comments during his mini-opening statement, telling the prospective jurors,

> Probably most of the people that you're going to hear about that are involved at [*sic*] this incident are not Eagle Scouts. . . . So I think you're not going to be hearing from the most impeccably upstanding members of the community. . . . Maybe these aren't going to be the people that you would necessarily want to hang out with on a daily basis.
>
> * * *
>
> [P]lease think about the questions and the issues that [the prosecutor] and I have talked about so that we can make sure that we get a fair and impartial jury.

4

¶16        After counsel presented their mini-opening statements and the court addressed some other matters, the court asked the prospective jurors whether any of them would "be unable to serve as jurors" based "on the nature of the case[.]" No juror indicated that evidence of drug use would affect his or her ability to be fair and impartial.[2]

¶17        The State called Newbeck, Brandon, Angela, two other witnesses who were living on the Property at the time, the medical examiner, and various law enforcement officials. Newbeck, Brandon, and Angela testified about their observations of the confrontation Dennis had with Carter and his father, and about Carter's shooting of Dennis. None of the witnesses testified that Dennis behaved erratically before the shooting. The State also presented the recording of a call Carter made from jail to a third party in which Carter claimed to have shot Dennis "in the chest." The medical examiner testified that Dennis was shot in the back, not in the chest.

¶18        Carter did not testify on his own behalf, but presented the testimony of certain other witnesses, including a medical expert who testified that methamphetamine is "capable of causing hallucinations, aggressive behavior, and irrational reactions." Carter also called two witnesses who were present on the Property at the time of the fatal confrontation. Neither of these witnesses testified that Dennis behaved erratically at the time.

¶19        At Carter's request, the court instructed the jury on self-defense. The self-defense instructions stated in part that "[t]he use of physical force is justified if a reasonable person in the situation would have reasonably believed that immediate physical danger appeared to be present."

¶20        The court further instructed the jurors as follows:

> You must consider all of these instructions. Do not pick out one instruction or part of one and disregard the others. However, after you have determined the facts, you may find that some instructions no longer apply. You must then consider the instructions that do apply, together with the facts as you have determined them. Decide this case by applying these instructions to the facts which you find.

¶21        During closing arguments, the prosecutor asserted that the evidence showed that Carter and his father came to the Property that night

---

[2] One prospective juror was excused for cause after expressing views about guns that suggested a predisposition against the defendant's position.

to "confront" Dennis "at his own home[,]" and the circumstances of their arrival – under a "cloak of darkness," with "both" men "armed" and without "identify[ing] themselves" – showed that they had "nefarious intentions[.]" Dennis "had a right to go out of his house with a gun," the prosecutor maintained, "to see what [was] going on" and to "tell[] them to leave." At that point, he said, Carter and his father should have left. The prosecutor acknowledged that Dennis "had meth in his system" at the time, but noted that "no specific evidence" showed "that [Dennis] was acting erratic [*sic*]" and, further, that Dennis had "already started to walk away" when Carter shot him. Ultimately, the prosecutor argued, a claim of self-defense turns on what "a reasonable person in a similar situation" would do, and, here, "[t]here was nothing reasonable about what [Carter] did[.]" Accordingly, the prosecutor stated, the self-defense instructions "simply do not apply." "You can disregard them[,]" the prosecutor added, "[b]ecause they don't align with the facts."

¶22        Defense counsel did not object to the prosecutor's closing argument.

¶23        In his closing argument, defense counsel contended that the fatal confrontation that night was simply a "stupid argument" that escalated because Dennis chose to fire his gun. According to defense counsel, the evidence indicated that Dennis became "angry" and overreacted because "he had all this meth in his system[.]" Counsel acknowledged that Carter fired his gun, too, but argued that "the difference is [Dennis] fired first." "[T]he only reason that [Dennis] was shot[,]" counsel maintained, was "because he and he alone decided to elevate what was going on into a life or death situation[.]"

¶24        Defense counsel echoed the prosecutor's comments about illegal activity occurring on the Property. "[B]oth the state and the defense are in agreement[,]" defense counsel stated, "about the witnesses in the case[.]" "It would be nice[,]" he went on, "if we could have brought in Mother Teresa . . . and Mahatma Gandhi, but we [were] not able to produce Mahatma Gandhi and Mother Teresa as witnesses for the simple reason that Mahatma Gandhi and Mother Teresa do not normally frequent flop houses."

¶25        After deliberating, the jury found Carter guilty of second-degree murder. The court sentenced Carter to a mitigated sentence of 14 years of imprisonment, with 406 days credited for pre-sentence incarceration.

¶26 Carter timely appealed. We have jurisdiction pursuant to Article 6, Section 9 of the Arizona Constitution and A.R.S. §§ 12-120.21, 13-4031, and 13-4033(A).

## DISCUSSION

¶27 Carter argues that the prosecutor committed misconduct during his mini-opening statements during jury selection and again in closing argument.

¶28 To establish prosecutorial misconduct, the defendant must show that first, "misconduct is indeed present[,]" and second, "a reasonable likelihood exists that the misconduct could have affected the jury's verdict[.]" *State v. Atwood*, 171 Ariz. 576, 606 (1992). Reversal is required only when the prosecutor's improper conduct deprived the defendant of a fair trial. *State v. Moody*, 208 Ariz. 424, 460, ¶ 152 (2004).

¶29 Because Carter did not object at trial to the statements he now challenges on appeal, we review for fundamental error.[3] *State v. Thompson*, 252 Ariz. 279, 293, ¶ 46 (2022). An error is fundamental if: "(1) the error went to the foundation of the case, (2) the error took from the defendant a right essential to his defense, *or* (3) the error was so egregious that he could not have possibly received a fair trial." *State v. Escalante*, 245 Ariz. 135, 142, ¶ 21 (2018). The defendant has the burden to establish fundamental error. *State v. Henderson*, 210 Ariz. 561, 567, ¶ 19 (2005).

### A. The prosecutor's statements during his mini-opening statement were not improper.

¶30 Carter argues that the prosecutor committed misconduct in his mini-opening statement by the "improper insinuation of drug-related criminality" that "conditioned the jury with stigmatizing associations unrelated to the charged offense." The prosecutor's mini-opening statement, Carter contends, implied "that the people involved" in this case

---

[3] After the verdict, Carter moved for a new trial, alleging that the prosecutor engaged in misconduct by mischaracterizing Carter's statements during the recorded jail call. The superior court denied the motion. Because Carter's new trial motion was based on different grounds, his new trial motion did not preserve the arguments he now raises on appeal. *See State v. Lopez*, 217 Ariz. 433, 434, ¶ 4 (App. 2008) ("[A]n objection on one ground does not preserve the issue on another ground.").

"were drug-associated, and that the jury should interpret testimony through that stigmatizing lens."

¶31        The jury selection process is intended to ensure that each case is decided by fair and impartial jurors. *See State v. Lucas*, __ Ariz. __, __, 578 P.3d 822, 826, ¶ 23 (App. 2025) ("Jury selection is the primary means by which a court enforces a defendant's right to be tried by an impartial jury." (citation modified)). Voir dire is a central component of that process, because it serves to "unveil" prospective jurors' biases and prejudices that may lead them to favor one party over another. *State v. Verive*, 128 Ariz. 570, 576 (App. 1981); *see also Lucas*, 578 P.3d at 826, ¶ 23 ("[Voir dire's] purpose is to identify those who should be *excluded* from the jury." (citation modified)).

¶32        Voir dire cannot properly be used to call prospective jurors' attention to irrelevant and potentially prejudicial matters. *See Matter of Skone*, 543 P.3d 842, 863, ¶¶ 70-73 (Wash. App. 2024) (reversing defendant's convictions arising out of alleged gang-related shooting based on prosecutor's misconduct during voir dire in asking "irrelevant questions" that included "harmful references" to ethnic stereotypes); *cf. State v. Leon*, 190 Ariz. 159, 161, 163 (1997) (reversing defendant's conviction for drug offense based on prosecutor's improper comment, during closing argument, about "prior [drug] transactions if there were any"; "[T]he prosecutor was not entitled to refer, by innuendo or otherwise, to evidence that had been ruled inadmissible.").

¶33        Prospective jurors may, however, properly be asked if they have opinions or beliefs about the issues in the case that would prevent them from evaluating the evidence fairly. Ariz. R. Crim. P. 18.5(g) ("Questioning must be limited to inquiries designed to elicit information relevant to asserting a possible challenge for cause."); *State v. George*, 206 Ariz. 436, 444, ¶ 19 (App. 2003) ("Prospective jurors should be struck for cause whenever their answers during voir dire demonstrate serious misgivings about the ability to be fair and impartial." (quotations omitted)). Likewise, in opening statements counsel may properly "prepare the jury for the evidence that is to be presented." *State v. King*, 180 Ariz. 268, 278 (1994). If, therefore, evidence is expected to be presented at trial showing that a party, witness, or victim had engaged in illegal drug use, counsel may properly inquire into whether evidence of such drug use, by itself, would affect the prospective jurors' ability to be fair and impartial. *See State v. Allie*, 147 Ariz. 320, 329 (1985) (rejecting defendant's claim that trial court erred in telling prospective jurors "that evidence concerning drug and alcohol abuse by persons involved might surface"; "[T]he trial court's statement

was a proper means of determining whether evidence of drug or alcohol usage would create a problem for a prospective juror and therefore require exclusion from the panel."); *cf. State v. Bush*, 244 Ariz. 575, 585, ¶ 36 (2018) (rejecting defendant's challenge to fairness of the jury selection process and noting that the defendant "was allowed to question potential jurors on whether the anticipated evidence would prevent them from being fair and impartial").

¶**34**　　　　Here, the prosecutor never suggested, in his mini-opening statement, that Carter himself had used illegal drugs on the night of the fatal shooting. Instead, the prosecutor informed the jurors that evidence would be presented showing that the victim and some of the witnesses had done so. Carter's defense focused on his contention that he shot Dennis in fear for his own safety. In support of his defense, Carter cited evidence that Dennis had used methamphetamine earlier that night and that methamphetamine use can cause aggressive and erratic behavior. Because Carter relied on Dennis's drug use to support his defense, the State was entitled to inquire into whether any of the prospective jurors' attitudes toward drug use would prejudice them against the victim, preventing them from fairly evaluating the evidence. *See State v. Polak*, 499 P.3d 565, 571, ¶ 19 (Mont. 2021) (rejecting defendant's claim that prosecutor committed misconduct by indicating during opening statement that "many of its witnesses lived lifestyles that involved drug use"; "It was not improper for the State . . . to prepare the jury for the expected focus of the defense on [witness's] alleged methamphetamine use and [victim's] testing positive for . . . methamphetamine at the time of his death."); *cf. State v. Holtsoi*, 547 P.3d 770, 776 (N.M. App. 2024) (following battery conviction of defendant who admitted illegal drug use prior to events leading to her arrest, appellate court held that trial court committed reversible error in denying defendant's motion to excuse for cause a prospective juror who indicated during voir dire "that he could not separate his bias regarding drug use from the facts of the case").

¶**35**　　　　And even if we were to accept Carter's contention that the prosecutor's statements during his mini-opening about drug use by those living on the Property were in some way improper, we could not possibly find the requisite prejudice because Carter's attorney made similar comments throughout the trial. Defense counsel, after all, referred to the Property as a "flop house" and noted that the witnesses were "not . . . the most impeccably upstanding members of the community." Carter can hardly claim to have been prejudiced by a prosecutor's unflattering comments about the victim and witnesses when those comments were echoed by his own attorney. *Cf. State v. Acuna Valenzuela*, 245 Ariz. 197, 221,

¶ 100 (2018) (prosecutor did not commit misconduct in making comments during closing argument in murder trial's penalty phase about defense counsel's failure, in his closing argument, to address defendant's motive for the killing; "The topics on which the prosecutor touched . . . were a proportionate response to the topics defense counsel addressed[.]"); *United States v. Poole*, 735 F.3d 269, 277 (5th Cir. 2013) (holding that prosecutor did not commit misconduct in closing argument by referring to defendant as a "liar" because defendant testified at trial that his inculpatory statements to arresting officers were false; "[T]he prosecutor does not commit error by characterizing the defendant as a liar" if the defendant's "entire defense is that he lied to law enforcement."). We discern no error, and certainly no fundamental error, in the prosecutor's comments about drug use during his mini-opening statement.

## B. The prosecutor's statements during closing argument were not improper.

¶36        Carter argues that the State committed misconduct in closing argument by telling the jury to "disregard" the self-defense instructions. By telling the jury to "disregard" the self-defense instruction, Carter insists, the prosecutor "removed these questions from the jury's consideration" and "invaded the jury's constitutional role[.]"

¶37        Prosecutors may not, of course, misstate the law in closing argument. *State v. Rushing*, __ Ariz. __, __, 573 P.3d 72, 91, ¶ 66 (2025). They may, however, "summarize the evidence, make submittals to the jury, urge the jury to draw reasonable inferences from the evidence, and suggest ultimate conclusions." *State v. Smith*, 250 Ariz. 69, 100, ¶ 144 (2020) (citation omitted). When considering a challenge to statements made during closing argument, "courts should look to the context in which the statements were made as well as the entire record and to the totality of the circumstances." *State v. Vargas*, 251 Ariz. 157, 178, ¶ 76 (App. 2021) (citation modified).

¶38        Here, the prosecutor discussed the evidence in detail in arguing that it did not support Carter's claim of self-defense. He then told the jurors that they could "disregard" the self-defense instructions "[b]ecause they don't align with the facts." The prosecutor's argument that the evidence did not support Carter's claim of self-defense, and therefore that the self-defense instructions were inapplicable to the case, was not improper. On the contrary, the prosecutor's argument was consistent with the court's instruction to the jury that "after [they] have determined the facts, [they] may find that some instructions no longer apply[,]" and that they must then "consider the instructions that do apply[.]" The prosecutor's

argument correctly stated the law, and so did not constitute misconduct. *See State v. Montoya*, 258 Ariz. 128, 148, ¶ 41 (2024) (rejecting challenge to prosecutor's closing argument because argument did not "conflict with" jury instructions or otherwise misstate the law). Carter is entitled to no relief.

## CONCLUSION

¶39     We affirm Carter's conviction and sentence.



**MATTHEW J. MARTIN • Clerk of the Court**
**FILED**:          JR